Filed 6/26/25  Adoption of A.W. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| Adoption of A.W., a Minor. | C102547 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.W.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD242441) |

Appellant A.W. (mother) appeals from the juvenile court's orders terminating her parental rights over the minor A. (minor) and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395; statutory section references that follow are to the Welfare and Institutions Code.)  Mother claims the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply.  We will affirm the juvenile court's orders.

1

FACTS AND HISTORY OF THE PROCEEDINGS

Mother and the minor came to the attention of the Sacramento County Department of Child, Family and Adult Services (Department) in March 2023 when the minor's then 16-month-old half sibling, E.B., was found to have suffered numerous injuries, including a skull fracture, chronic subdural hemorrhages, and atrophy of the brain, as well as global developmental delay, malnutrition, and failure to thrive. Six months earlier, E.B.'s pediatrician advised mother to have E.B. assessed by a neurologist due to developmental delays. Mother initially denied the child needed to be seen by a neurologist, but she eventually capitulated. A neurologist determined E.B. might have cerebral palsy and ordered an MRI but mother failed to have the scan completed as instructed. Child abuse specialist Dr. Yuk determined E.B.'s injuries were likely the result of physical abuse or neglect. Mother denied any physical abuse of E.B.

The Department learned that mother had a developmental disability which impaired her cognitive functioning and ability to provide adequate care, supervision, and protection for the children. The minor also had developmental disabilities and was receiving service from Alta California Regional Center. The maternal great aunt informed the Department that she had been acting as the minor's informal guardian for the prior two years. Dr. Yuk concluded there were safety concerns if either E.B. or the minor were left in the care of mother or maternal great aunt, both of whom failed to recognize and respond to any of the signs of E.B.'s serious health concerns.

In April 2023, the Department filed a dependency petition on behalf of the minor (then five years old) alleging: (1) risk of serious physical harm to the minor due to mother's physical abuse or neglect of E.B.; (2) failure or inability of mother to protect the minor due to mother's physical abuse or neglect of E.B. and her developmental disability which impaired her cognitive functioning, placing the minor at risk of serious physical harm, abuse, or neglect; and (3) substantial risk of abuse or neglect of the minor due to mother's abuse or neglect of E.B. and mother's prior abuse or neglect of two of the

minor's older half siblings resulting in termination of mother's parental rights over those two half siblings in 2012. (§ 300, subds. (a), (b) & (j).) The juvenile court ordered the minor and E.B. detained and ordered supervised in-person visits for mother twice a week.

In May 2023, the minor and E.B. were placed together in the home of mother's stepsister, a non-related extended family member (NREFM) who is a licensed foster caretaker. Mother was living with maternal great aunt and mother's visits with the minor were reportedly going well. By June 2023, mother was participating in parenting education classes, and her visits with the minor continued without incident.

The Department reported that, during the extended period the minor was in the maternal great aunt's care prior to removal, mother failed to ensure the minor received educational services or to address the minor's special needs despite showing signs of speech delays. Given the minor's limited verbal skills, the Department was unable to determine the quality of the minor's relationship with mother despite the absence of any concerns during visits because mother was not voluntarily engaged in reunification services. The Department recommended the juvenile court bypass mother's reunification services based on her prior dependency case which ultimately resulted in termination of her parental rights over the minor's two half siblings (§ 361.5, subds. (b)(5), (6), (10) & (11)), and find it was not in the minor's best interest to offer mother reunification services as she would not likely benefit from services within the statutory six-month reunification period. (§ 361.5, subd. (c).)

In November 2023, the juvenile court sustained the allegations in the petition as modified on the record, exercised jurisdiction over the minor and E.B., and adjudged the two children dependents of the juvenile court. The court bypassed mother's reunification services (§ 361.5, subds. (b)(6), (10) & (11)) and found services would not be in the minor's best interest (§ 361.5, subd. (c)).

In April and May 2024, the Department reported the minor and E.B. remained in the home of the NREFM. The social worker had monthly face-to-face contact with the

3

minor, who was reportedly doing well in the NREFM's home. Mother had no contact with the Department, but she continued to visit the minor twice a week for one hour. Visits were supervised by the NREFM. The Department recommended the juvenile court continue the minor's out-of-home placement and set a section 366.26 hearing with adoption as the permanent plan. On June 5, 2024, the juvenile court set a section 366.26 hearing.

In its selection and implementation report, the Department reported the NREFM supervised mother's weekly visits with the minor in the public library. Mother attended visits consistently, only missing a couple of visits due to illness. The NREFM reported that mother and the minor spent most of their time playing on the computer. Mother required redirection concerning the amount of time the minor should spend on the computer during visits. According to the NREFM, it appeared mother did not know how to engage the minor and therefore did not spend quality time with the minor. The NREFM also reported that the minor did not exhibit any adverse behaviors before or after visits with mother. She did not cry at the end of visits, she transitioned back to her foster home without incident, and she did not ask about mother between visits.

The social worker continued to have monthly face-to-face contact with the minor, and the NREFM maintained consistent contact with the Department. The social worker reported that the minor was "safe and stable in her placement" and she "clearly has a significant relationship with her caretaker and the caretaker's extended family." The NREFM was able to meet the minor's physical, emotional, developmental, and mental needs, and advocate for services for her. The minor was thriving and improved "greatly" since being placed with the NREFM in May 2023.

The social worker reported that the minor exhibited a strong connection to the NREFM and was comfortable in her placement. On the other hand, the minor reportedly had no relationship with mother such that termination of parental rights would cause emotional damage. The social worker opined that, although mother maintained regular

visitation, the minor was not fully engaged during visits and spent most of the time playing on the computer. The social worker further opined that it appeared the minor viewed mother more like a friendly visitor than a primary caretaker.

The contested selection and implementation hearing commenced on November 18, 2024. Mother testified the minor lived with her for the first three years of the minor's life and then the maternal great aunt took over the minor's care. Prior to removal, mother had daily contact with the minor via video, talked with her "all the time," and saw her in person every weekend. After the minor was removed from mother's custody, mother had twice weekly visits with her at the public library, supervised by the NREFM. Mother testified that, at the beginning of visits, the minor was excited to see her, said "Hi, mommy," and hugged her. Occasionally, mother brought food to the visits and, after the minor ate, they went straight to the library where the minor played on the computer. If the computers were occupied, mother and the minor would sit on the floor and play with toys. Mother testified that the minor enjoyed their time together and did not want the library to close at the end. Mother further testified that, at the end of visits, she walked the minor to the car, hugged and kissed her, and said "I'll see you later." At the end of one visit, the minor asked, "can I go home?" Mother testified it was not in the minor's best interest to terminate parental rights because her bond with the minor was stronger than the bond between the minor and the NREFM. Mother testified that termination of parental rights would negatively affect the minor and cause her to keep acting out in school "because [the minor] misses me."

The social worker testified she had only been assigned to the minor's case for four months (since July 2024). She confirmed the NREFM supervised visits between mother and the minor. She testified she had not personally observed mother and the minor during visits, as visits occurred after her work hours to accommodate the NREFM's schedule. However, nothing gave her reason to doubt the NREFM's reports about the visits. The social worker testified mother never contacted her and she never attempted to

contact mother, noting mother had already been bypassed for reunification services and the focus was on obtaining permanency for the minor.

The social worker also testified that, in making an assessment for the best permanent plan for the minor, she considered mother's visitation, connection with the minor, ability to provide care, previous child welfare and criminal history, and previous participation in services, as well as the minor's sibling bonds. The social worker confirmed she obtained information about mother's visits with the minor from the NREFM. The minor's young age (now six years old) made her generally adoptable. The fact that her half sibling was adopted in October 2024 made the minor specifically adoptable as part of a bonded sibling set.

The social worker testified it was difficult to describe mother's relationship with the minor because of the minor's developmental delays and difficulty communicating beyond "yes" and "no" responses. The social worker noted the minor called both the NREFM and mother "mommy."

Mother's counsel argued the parental beneficial relationship exception to adoption should apply given mother's consistent contact with the minor and mother's belief that it would be detrimental to the minor to terminate their relationship. Counsel argued the minor benefited from mother's regular and frequent visits, was excited to see mother, called mother "mommy," and mentioned "she [the minor] wants to go home with her [mother]." Counsel also argued the minor, who has intellectual disabilities, would be very confused if she were permanently separated from mother after having seen mother on a consistent and regular basis, interacting with her as her mother, and enjoying the time spent with mother. Mother's counsel requested the juvenile court order legal guardianship as the permanent plan.

On November 18, 2024, the juvenile court, having considered the Department's reports and the evidence presented at the hearing, adopted the Department's proposed findings and orders, including that the minor was likely to be adopted and was

6

specifically adoptable, and that termination of parental rights would not be detrimental to the minor. The court terminated parental rights and ordered a permanent plan of adoption.

DISCUSSION

Mother contends the juvenile court erred in finding the beneficial parental relationship exception to adoption did not apply. She claims the court failed to undertake an analysis of her visitation with the minor, or to determine whether a bond existed between them, as required by section 366.26 and *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

At the selection and implementation hearing held pursuant to section 366.26, if the juvenile court finds that the child is likely to be adopted and that "there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C., supra*, 11 Cal.5th at pp. 630-631; *In re M.V.* (2025) 109 Cal.App.5th 486, 507; see § 366.26, subds. (c)(1)(B)(i)–(vi), (c)(4)(A).)

"One of the exceptions, the beneficial parental relationship exception, applies when (1) 'the parent has regularly visited with the child'; (2) 'the child would benefit from continuing the relationship'; and (3) 'terminating the relationship would be detrimental to the child.' " (*In re M.V., supra*, 109 Cal.App.5th at p. 507, quoting *Caden C., supra*, 11 Cal.5th at p. 629; see § 366.26, subd. (c)(1)(B)(i).) The party claiming the beneficial parental relationship exception has the burden of establishing supporting circumstances. (*Caden C.*, at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child

bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.)  The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment.  (*Caden C., supra*, 11 Cal.5th at p. 630; *In re K.P.* (2012) 203 Cal.App.4th 614, 622.)  We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Caden C.*, at p. 641.)

Here, the first prong of the exception—regular visitation and contact with the minor—is undisputed.  The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted." (*Caden C., supra*, 11 Cal.5th at p. 636.)  The Department reported that mother regularly attended weekly visits with the minor, only missing a few visits due to illness, and concedes this element of the exception has been met.  Nevertheless, mother asserts the Department's documentation regarding visitation was devoid of any personal observations by the social worker who relied instead on the NREFM's reports, and therefore the juvenile court could not conduct a proper analysis of her visitation with the minor to determine whether the beneficial parental relationship exception applied.

As a preliminary matter, mother does not cite, and our research has not disclosed, any authority requiring the social worker, rather than the minor's caretaker (here, the NREFM), to supervise visits or make personal observations thereon.  Despite mother's insinuation that the NREFM's desire to adopt the minor somehow colored her reports on visits between mother and the minor, the social worker testified she could not observe visits because visits were held after her scheduled work hours to accommodate the NREFM.  The social worker also testified that the NREFM never gave her any reason to believe she was unreliable or providing inaccurate information.

8

In any event, the juvenile court received the Department's report and the social worker's testimony, all of which demonstrated that visits were supervised by the NREFM, who reported that the minor spent most of the visits playing on the computer, and that mother needed to be redirected concerning the amount of visitation time the minor spent on the computer. According to the NREFM, it appeared that mother did not otherwise know how to engage the minor, thus leading the NREFM to conclude that mother's time with the minor during visits did not amount to quality time.

The juvenile court also considered the social worker's responses to questions posed by mother's counsel about why the social worker never observed mother and the minor interact during visits and whether the NREFM, acting as visitation supervisor, was also interested in adopting the minor. Finally, the court heard mother's counsel challenge the testimony of the social worker based on her reliance on secondhand information from the NREFM to assess visits between mother and the minor rather than making those observations herself. The juvenile court properly relied on the whole of that information to determine whether mother met her burden as to regular and consistent contact with the minor.

The same is true of the second and third prongs of the exception—the nature of the parent-child relationship and whether termination of that relationship would cause the minor emotional harm. The parent must show the minor "has a substantial, positive, emotional attachment to the parent – the kind of attachment implying that the child would benefit from continuing the relationship" and that "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) The juvenile court received evidence that the minor was six and a half years old and spent only three years of her life in mother's custody before maternal great aunt took over her care for nearly two years, after which the minor was removed pursuant to the dependency proceedings. The court also received evidence regarding the effect of the interaction between mother and the

9

minor, namely that the minor spent most of the visitation time playing on the computer with little engagement from mother and little interaction between them until the visit was concluded. And, according to the NREFM who supervised every visit, when mother had to be redirected concerning the amount of computer time the minor should have during visits, it appeared mother did not know how to otherwise engage the minor. The minor reportedly had no adverse behaviors separating from mother when visits ended. The court also received evidence regarding the minor's particular needs (e.g., services for speech and developmental delays). (See *In re Autumn H., supra*, 27 Cal.App.4th at pp. 575-576 [variable which logically affects a parent-child bond].)

Mother claims the Department's reports contained scant evidence of the nature of her relationship with the minor, the strength of that relationship, and whether the minor would suffer any potential harm if the relationship were terminated. Again, we disagree. The social worker testified the minor referred to both mother and the NREFM as "mommy." But the NREFM reported the minor did not cry or exhibit any adverse behaviors before or after visits with mother, did not ask about mother between visits, and easily transitioned back to her placement home after visits. The social worker testified that it was difficult to describe the minor's relationship with mother because the minor has developmental delays causing her to have very limited communication consisting mostly of "yes" and "no" when asked a question. Finally, the social worker reported that the minor had no real relationship with mother such that termination of parental rights would cause the minor emotional damage.

Mother argues the juvenile court failed to engage in a "subtle, case specific inquiry" into whether the benefit of placement in an adoptive home would outweigh the harm to the child in losing a " 'significant, positive, emotional relationship' " with the parent. (*Caden C., supra*, 11 Cal.5th at pp. 633-634.) Yet *Caden C.* does not require the juvenile court to expressly set forth its inquiry. As in this case, we can infer the court's analysis from the evidence and testimony in the record. The Department presented

evidence that the minor's relationship with mother did not rise to the level of a primary caretaker, the minor spent most of each visit on the computer and it appeared mother did not know how to engage the minor, the minor seemed to enjoy her visits with mother but had no difficulty leaving mother at the end of the visits nor being away from mother between visits, the minor did not ask about mother between visits, the minor called both mother and the NREFM "mommy," and the minor exhibited a strong connection to the NREFM but had no such relationship with mother.

Finally, mother's claims that the Department failed in its duty to prepare an adequate pre-adoption study and that its report failed to comply with the requirements of sections 366.21 and 366.22 are forfeited, as mother raises these claims for the first time on appeal. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 221-222 [party forfeits the right to claim error as grounds for reversal on appeal when she fails to raise the objection in the trial court]; *In re R.Q.* (2023) 96 Cal.App.5th 462, 470 [points raised for first time on appeal in a reply brief will ordinarily not be considered].)

The juvenile court did not err in finding the beneficial parental relationship exception to adoption did not apply.

DISPOSITION

The juvenile court's orders are affirmed.

_____<br>
HULL, Acting P. J.

We concur:

_____<br>
KRAUSE, J.

_____<br>
BOULWARE EURIE, J.